UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 04-23223-CIV-COOKE/BANDSTRA

JOSE GUEVARA,

     *Plaintiff*,

v.

REPUBLICA DEL PERU, *et al*.,

     *Defendants*.

_____/

**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AS TO COUNTS I AND II OF THE COMPLAINT AND
DENYING DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT**

This matter is before me on Plaintiff's Motion for Partial Summary Judgment as to Counts

I and II of the Complaint [D.E. 119] and the Peruvian Government's Cross Motion for Summary

Judgment [D.E. 203]. Plaintiff's Motion for Partial Summary Judgment is granted as there are no

genuine issues of fact regarding whether Plaintiff Jose Guevara ("Guevara") enabled Montesino's

capture.

## *I. BACKGROUND*

This is a lawsuit to collect a $5,000,000.00 reward offered by Defendant Peru ("Peru") in

exchange for information leading to the capture and arrest of an international fugitive, Vladimiro

Lenin Montesinos Torres ("Montesinos"). Guevara alleges that he accepted the reward by providing

Peru with accurate information and assistance that led to the location and capture of Montesinos

under the terms of Peru's offer. Guevara, however, was never paid the reward.

Montesinos served as presidential adviser and head figure of the National Intelligence System

of Peru during the 1990s.  During that time, Montesinos organized a net of corruption covering a wide spectrum of illicit activities, including arms trafficking, drug dealing, money laundering, extortion, and murder.  After a public corruption scandal led to a change in Peru's government, Montesinos went into hiding in October 2000.  In April 2001, Peru enacted Emergency Decree No. 049-2001.  Under the Decree, Peru offered a reward of $5,000,000.00 to anyone who could provide information enabling the location and capture of Montesinos.  In December 2000, the United States Ambassador to Peru contacted Special Agent Kevin Currier ("Currier") and communicated Peru's request for the Federal Bureau of Investigations' ("FBI") assistance in locating and apprehending Montesinos.

Since December 16, 2000, Guevara had been providing private security and shelter to Montesinos in Venezuela.  In June 2001, Guevara traveled to Miami, Florida to attend a meeting on behalf of Montesinos.  On June 22, 2001, while in Miami, Guevara was taken into custody by FBI agents.  After Guevara was taken into custody in Miami, and upon learning of Guevara's willingness to cooperate with the FBI to apprehend Montesinos, Special Agent Currier formulated a plan for the capture of Montesinos.  On June 23, 2001, Currier met with Peru's then Minister of the Interior, Antonio Ketin Vidal ("Ketin Vidal") regarding the search for Montesinos.  Currier informed Ketin Vidal of Guevara's capture and of his willingness to cooperate in locating Montesinos and delivering him to Peruvian authorities.  Currier and Ketin Vidal reached agreement on a plan for using Guevara's cooperation to have Montesinos delivered to the Peruvian ambassador's residence in Caracas, Venezuela.  This plan included offering Guevara the $5,000,000.00 reward offered by Peru for information resulting in the location and capture of Montesinos.  Ketin Vidal subsequently informed Currier that he had spoken with Peru's interim President, Valentin Paniagua, who approved

the operation, including the reward offer to Guevara.

On Currier's instructions, and with Ketin Vidal's express approval, Special Agents Longa and Bob Jones relayed the offer to Guevara in Miami.  FBI Special Agent Waldo Longa informed Guevara that if he agreed to help the FBI locate and apprehend Montesinos, he would be released, all charges against him would be dropped, and he would be eligible for the $5,000,000.00 reward offered by Peru.  Upon learning of the reward offer, Guevara provided the FBI with information on Montesinos's whereabouts.  Guevara also made telephone calls (monitored by the FBI on Peru's behalf) to his compatriots in Venezuela to coordinate Montesinos's delivery into custody.  Guevara contends that, as a result of his cooperation, Montesinos was captured and arrested by Venezuelan authorities on the evening of June 23, 2001.

Ketin Vidal traveled to Miami, Florida, and requested a meeting with Guevara.  On July 10, 2001, Guevara met with Ketin Vidal, Alfredo Ferreiro (then Consul General of Peru in Miami), and Special Agent Longa in Miami.  Guevara alleges that, during the meeting, Ketin Vidal thanked Guevara on behalf of Peru for providing the information and assistance that enabled Montesinos' location and capture.  Guevara also alleges that, during this meeting, Ketin Vidal reaffirmed Peru's commitment to pay Guevara the reward in Miami, Florida.

In February 2002, Guevara met with Magali Bascones, a Peruvian judge, in Miami.  Judge Bascones flew to Miami and met with Guevara at the FBI's Miami South Division offices.  Jose Ugaz, the prosecutor assigned to the Montesinos public corruption investigation in Peru, also attended this meeting.  Both Bascones and Ugaz allegedly told Guevara that Fernando Rospigliosi, then Peru's Minister of the Interior, had asked them to tell Guevara that Peru would pay him the $5,000,000.00 reward.  According to Guevara, Special Agent Currier subsequently followed up with

a number of Peruvian officials, each of whom assured Currier that Ketin Vidal had acknowledged

that Guevara was entitled to the reward.

In a Resolution dated August 5, 2002, the Special Committee in Peru created by the

Emergency Decree to administer the reward stated:

> **WHEREAS:**
>
> On June 23, 2001 Venezuelan national Jose Guevara provided information leading to the location and capture of Vladimiro Lenin Montesinos Torres to the Chair of the Special High Level Committee of the Department of Homeland Security at the time, PNP Lieutenant General Antonio Ketin Vidal Herrera for the purpose of receiving the financial reward stipulated in Emergency Decree No. 049-2001:
>
> Mr. Jose Guevara made his request by and through his attorney, set forth in briefs sent to this Committee on February 6 and 19, 2002;
>
> The request made by Mr. Jose Guevara is in keeping with the procedure stipulated in Emergency Decree No. 049-2001, issued on April 16, 2001;
>
> The Special High Level Committee of the Department of Homeland Security must decide the request made by Mr. Jose Guevara base [sic] on the analysis of the facts set forth in his request;
>
> **DECIDES:**
>
> To authorize processing of the request filed by Mr. Jose Guevara for evaluation by the Special High Leval Committee of the Department of Homeland Security.

As of today, Peru has not paid Guevara.

## II.  LEGAL STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be

rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  According to

the U.S. Supreme Court, "the plain language of Rule 56(c) mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. . . [o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11ᵗʰ Cir. 1991). Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. Thus, the nonmoving party "'may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1984) (stating "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court, however, must view the evidence in the light most favorable to the nonmoving party, and summary judgment is inappropriate where a genuine issue of material fact remains. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Furthermore, the court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied. *Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1140 (11th Cir. 2007) (citing *Carlin Commc'n, Inc. v. S. Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986)).

### III.  DISCUSSION

5

### A.       There Are No Genuine Issues of Material Fact for Trial

The parties agree that Peru's offer of a reward in exchange for information was an offer to enter into a unilateral contract.  *See Ballou v. Campbell*, 179 So. 2d 228, 229 (Fla. 2d DCA 1965) ("A unilateral contract is one in which no promisor receives a promise as consideration for his promise.").  The only consideration necessary in a unilateral contract is the offeree's performance. *Id.*  Once the offeree performs, the offeree has accepted the offer, thereby creating a contract that binds the offeror.  *Id.*  Peru's Emergency Decree No. 049-2001 offered a reward of $5,000,000.00 for information enabling the location and capture of Montesinos.  All that remained for completion of the contract was for someone to perform the terms of the offer by providing such information. Guevara argues that the Emergency Decree constituted a unilateral offer that became a completed contract upon Guevara's delivery of information and cooperation in the capture of Montesinos.  As evidence that he delivered information that enabled Peru to locate and capture Montesinos, Guevara points to the August 5, 2002 Resolution and the sworn declaration of Special Agent Currier.  Peru, on the other hand, argues that the Resolution only authorizes the processing of Guevara's claim and that Currier's declaration is not entirely based on personal knowledge.

The August 2002 Resolution supports the entry of summary judgment in favor of Guevara as it declares that Guevara provided information leading to the location and capture of Montesinos. Peru attempts to read ambiguities into the Resolution by arguing that it only authorizes the processing of Guevara's claim.  It further argues that, because the Special Committee is only authorizing the processing of the claim, it could not have already analyzed the facts underlying the claim.  The plain language of the Resolution makes it clear, however, that the Special Committee had already found that Guevara provided information leading to the location and capture of

6

Montesinos and was only determining whether to pay him.

Furthermore, Currier's declaration establishes that Guevara provided the information Peru needed to capture Montesinos. Peru's claims that the declaration is not based on personal knowledge is unfounded. Currier begins his declaration by stating that, in December 2000, the United States Ambassador to Peru personally contacted him and requested the F.B.I's assistance in locating and apprehending Montesinos. Currier Decl. at 1-2. In early June 2001, Currier learned that agents Longa and Jones had arrested Guevara on June 22, 2001 and that Guevara agreed to cooperate with the agents to apprehend Montesinos. *Id.* at 2. Currier further declares that he, along with the Miami agents, formulated a plan to capture Montesinos who, Guevara told them, was hiding in Caracas, Venezuela. *Id.* The following day, Currier, accompanied by the United States Embassy's Charge d'Affaire, met with Ketin Vidal to discuss the search for Montesinos. *Id.* During that Meeting, Currier proposed to Ketin Vidal that Guevara's associates in Venezuela deliver Montesinos to Peru's embassy in Venezuela. Ketin Vidal proposed instead that Guevara's men deliver Montesinos to the Peruvian amabassador's residence in Caracas. *Id.* at 3. Currier and Ketin Vidal also discussed putting the $5,000,000.00 reward on the table for Guevara and his group so long as Guevera provided information leading to the location and capture of Montesinos. *Id.* With Ketin Vidal's express approval, Currier contacted Special Agents Jones and Longa in Miami and asked them to inform Guevara that, in exchange for his cooperation, Peru would offer him the $5,000,000.00 reward. *Id.* In response, Guevara provided the information and assistance that led to Montesinos's capture and arrest by Venezuelan authorities the evening of June 23, 2001. *Id.*

Peru has not provided any evidence to dispute the Resolution and Currier's declaration and, therefore, has not created a genuine issue of fact as to how Montesinos was captured. In defending

against this motion, Peru rests solely on their representation that Montesinos was captured by Venezuelan authorities.  Peru does not even explicitly contend that the Venezuelan authorities captured Montesinos with information obtained through another source other than Guevara. Under the decree, however, Guevara did not have to deliver Montesinos to Peru to receive the award. Guevara only had to provide information leading to his capture.  Venezuela's capture of Montesinos does not, therefore, defeat Guevara's entitlement to the award.  In the absence of evidence to the contrary, it appears that Venezuela learned of Montesinos's location from Guevara and would have been unable to capture him had Guevara not cooperated.

Ketin Vidal's and Rospigliosi's depositions are not inconsistent with Guevara's version of what transpired between the parties.  Neither Ketin Vidal's nor Rospigliosi's deposition testimony establish that Venezuela captured Montesinos without the information provided by Guevara. Rospigliosi merely states that he does not know whether Peru knew Montesinos's whereabouts independent of Guevara and that he believed that Guevara's petition for the reward did not have merit.  Rospigliosi Dep. at 50-51.  Rospigliosi explains that Guevara's petition did not have merit because the Venezuelan government captured Montesinos.  *Id*. at 52.  Again, without explaining the source of the Venezuelan government's information regarding Montesinos's location, it appears that Venezuela learned of Montesinos's location from Guevara.

At his deposition, Ketin Vidal denies having ever met with or spoken to the FBI in Peru or Miami about the reward offer.  He does, however, admit to meeting with two officials of the U.S. Embassy in Lima on June 23, 2001 regarding the search for Montesinos.  Statement of Material Facts in Dispute of the Republic of Peru and Ministry of Interior of Peru at 2.  This is the same day that Currier alleges he met with Ketin Vidal.  It, therefore, appears that Ketin Vidal met with Agent

Currier from the FBI, but was merely under the impression that Currier was an official of the U.S. Embassy in Lima.  Ketin Vidal also testified that he learned of Montesinos's capture through the statements made by Hugo Chavez, President of Venezuela.  This statement does not show that Guevara did not provide the information that Venezuela used to locate Montesinos.  Accordingly, Peru has not brought forth evidence to show that there exists a genuine issue of fact regarding whether Guevara provided the information that led to the location and capture of Montesinos.

The other two pieces of evidence provided by Peru also fail to establish that Venezuela captured Montesinos without Guevara's assistance.  Peru points to the Notice of Decision of the High Level Special Committee and to the Declaration of Ginocosta Santoalla ("Santoalla") as evidence that Montesinos was captured without Guevara's help.  In his declaration, Santoalla merely concludes that Guevara misinterprets the terms of the Resolution and that, on the record of the Special Committee, the arrest by Venezuelan officials was an event independent of Guevara's conduct.  Santoalla's declaration is conclusory.  It does not state what evidence was before the Special Committee showing that Venezuela knew where Montesinos was located independent of Guevara.  The Special Committee's Notice of Decision suffers from the same infirmity.  The Notice merely states that "it was unanimously resolved to deny your request for financial compensation . . . inasmuch as the requirements set in said legal norm for granting the aforesaid compensation were not met."  The Notice further states: "We emphasize that all the information related to the application of said Emergency Decree is secret, and those who violate this provision as provided in Article 6th of same, are subject to administrative, civil and/or criminal liability . . . ."  Peru has conveniently made the information related to the application of the decree secret so that no one could ever determine whether Guevara's information led to Montesinos's capture.  Peru then states that

Montesinos was captured by Venezuelan authorities and Guevara is supposed to take their statement at face value.  In order to avoid summary judgment, however, Peru has to show that the Venezuelan authorities captured Montesinos without help from Guevara.  As Peru has failed to do so, I am granting summary judgment in favor of Guevara on Counts I and II of the Complaint.

### B.    Awarding Guevara the Reward Does Not Violate Public Policy

The Eleventh Circuit has already considered the public policy issues in this case and has determined that, if Guevara is entitled to the reward, he should be paid.  In *Guevara v. Republic of Peru*, 468 F.3d 1289, 1303-1304 (11th Cir. 2006), the Court stated:

> Anything that makes it easier for countries to welch on their promises to pay for information decreases the real value of any reward they offer and makes it less likely that an offer will be accepted.  As Guevara has learned up to this point in the litigation, the promise of a multimillion dollar reward means little or nothing to an informant if the country offering the reward cannot be made to pay it.  The holding Peru asks us to reach would jeopardize not only its vital interests but those of every country that offers rewards for information, including this country.

Peru knew, at the time of contracting, the source of Guevara's information.  It should not now, after having received information regarding Montesinos, be allowed to use Guevara's association with Montesinos as a way to get out of paying the cost of its bargain with Guevara.

### C.    The Eleventh Circuit Has Already Determined My Jurisdiction in This Case

The Foreign Sovereign Immunities Act ("FSIA") provides the sole basis for obtaining subject matter jurisdiction over a foreign sovereign in the United States.  *Guevara v. Republic of Peru*, 468 F.3d 1289, 1294 (11th Cir. 2006).  I initially concluded that the FSIA barred Guevara's suit.  The Eleventh Circuit explicitly disagreed with me, stating: ". . . we disagree with the district court that the FSIA bars Guevara's suit . . . ."  *Id.* at 1305.  Accordingly, my jurisdiction in this case has been established.

10

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment as to Counts I and II of the Complaint [D.E. 119] is granted and the Peruvian Government's Cross Motion for Summary Judgment [D.E. 203] is denied.

**DONE AND ORDERED** in Miami, Florida, this 9th day of September 2008.

_____
MARCIA G. COOKE
United States District Judge

cc:

All counsel of record