# United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

**John Ley**
Clerk of the Court

For rules and forms visit
www.ca11.uscourts.gov

July 19, 2010

Steven M. Larimore
Clerk, U.S. District Court
400 N MIAMI AVE RM 8N09
MIAMI FL 33128-1813



FILED by _____ D.C.

JUL 2 3 2010

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

**Appeal Number: 08-17213-CC**
Case Style: Jose Guevara v. Republic of Peru
District Court Number:  04-23223 CV-MGC

The enclosed certified copy of the judgment and a copy of this court's opinion are hereby issued as the mandate of this court.

The clerk of the court or agency shown above is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being mailed to counsel and pro se parties. A copy of the court's decision was previously mailed to counsel and pro se parties on the date it was issued.

Sincerely,

John Ley, Clerk of Court

Reply To: James O. Delaney (404) 335-6113

Encl.

MDT-1 (06/2006)

# United States Court of Appeals

## For the Eleventh Circuit

No. 08-17213

District Court Docket No.
04-23223-CV-MGC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

Jun 18, 2010

JOHN LEY
CLERK

JOSE GUEVARA,

> Plaintiff-Counter-
> Defendant-Appellee
> Cross-Appellee,

LUIS ALFREDO PERCOVICH,

> Proposed Intervenor-Appellant,

versus

REPUBLIC OF PERU,
MINISTERIO DEL INTER,

> Defendants-Counter-Claimants
> Cross-Appellants,

ANTONIO KETIN VIDAL,
individually,
FERNANDO ROSPIGLIOSI,
individually,
DEPARTMENT OF JUSTICE,

> Defendants.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

--------------------------------------------------------------

Appeals from the United States District Court
for the Southern District of Florida

--------------------------------------------------------------

## JUDGMENT

It is hereby ordered, adjudged, and decreed that the attached opinion included herein by reference is entered as the judgment of this Court.

ISSUED AS MANDATE
JUL 1 9 2010
U.S. COURT OF APPEALS
ATLANTA GA

Entered:       June 18, 2010
For the Court:  John Ley, Clerk
By:            Patch, Jeffrey

CORRECTED                                    [PUBLISH]

## IN THE UNITED STATES COURT OF APPEALS

### FOR THE ELEVENTH CIRCUIT

No. 08-17213

D. C. Docket No. 04-23223-CV-MGC

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 18, 2010
JOHN LEY
CLERK

JOSE GUEVARA,

Plaintiff-Counter-
Defendant-Appellee
Cross-Appellee,

LUIS ALFREDO PERCOVICH,

Proposed Intervenor-Appellant,

versus

REPUBLIC OF PERU,
MINISTERIO DEL INTER,

Defendants-Counter-Claimants
Cross-Appellants,

ANTONIO KETIN VIDAL,
individually,
FERNANDO ROSPIGLIOSI,
individually,
DEPARTMENT OF JUSTICE,

Defendants.

———————————

Appeals from the United States District Court
for the Southern District of Florida

———————————

(June 18, 2010)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,* District Judge.

TJOFLAT, Circuit Judge:

The Republic of Peru, two of its ministries, and two of its government

officials (collectively "Peru") appeal the district court's award of summary

judgment to Jose Guevara on Guevara's claim that Peru owed him $5 million in

reward money for information that led to the arrest of Peru's former spy chief,

Vladimiro Lenin Montesinos Torres ("Montesinos"). Peru contends that the

district court should have recognized its sovereign immunity and therefore

dismissed Guevara's claim for lack of subject matter jurisdiction. Luis Alfredo

Percovich appeals the district court's denial of his motion to intervene in the case

(after the court granted Guevara's motion for summary judgment but prior to its

———————————

* Honorable Edward R. Korman, United States District Judge for the Eastern District of New
York, sitting by designation.

2

entry of final judgment) for the purpose of claiming the award.[1]  We agree with Peru that the district court lacked subject matter jurisdiction and therefore reverse its judgment and remand the case with the instruction that it be dismissed without prejudice.

I.

A.

This case's facts read like the latest spy thriller.  An earlier, and partial, recitation of the facts appears in this court's opinion in Guevara v. Republic of Peru, 468 F.3d 1289 (11th Cir. 2006) ("Guevara I"), which we recite in this subpart.  In the 1990s, Montesinos was the head of Peru's National Intelligence Agency.  During that time, while discharging the duties of his office, he purportedly committed several crimes—arms trafficking, drug dealing, money laundering, extortion, bribery, and "more than a few murders."  Id. at 1292.  The Peruvian media obtained videotapes of his participation in some of these crimes, including bribery, and after the videotapes became public, President Alberto Fujimori announced in September 2000 that he would dissolve the intelligence agency and step down as president.  Montesinos, seeing the writing on the wall,

---

[1]  Percovich filed his notice of appeal first.  Peru followed several days later.  Peru's appeal is therefore a cross-appeal.  We refer to the cross-appeal as the appeal because our disposition of it renders Percovich's appeal effectively moot.

fled the country, first into Venezuela, then, it seemed, into thin air.

A manhunt ensued, and in April 2001, Peru's Interim President, Valentin Corazao, issued an Emergency Decree that provided for a $5 million reward for the "person or persons who provide(s) accurate information that will directly enable locating and capturing" Montesinos. Id. at 1293.[2] The decree established a committee, the Special High Level Committee ("SHLC"), as part of the Ministry of the Interior to receive such information and assess its accuracy.[3] The decree authorized the Peruvian government to obtain a loan from a Peruvian bank to pay the reward, with the funds to be deposited in a Peruvian account in the interim. The reward would be paid twenty-four hours after Montesinos's capture.[4]

---

[2] The Emergency Decree was posted on the website of Peru's official daily publication, El Peruano.

[3] The Emergency Decree itself was attached to Guevara's motion for summary judgment, which, as discussed infra, he filed in the district court after remand in Guevara I. The certified court translator noted that Peru's Ministry of the Interior is equivalent to the United States Department of Homeland Security. We assume, therefore, that Peru's Minister of the Interior, to whom we refer throughout the opinion, holds a position comparable to the United States' Secretary of Homeland Security.

[4] As stated in Guevara I,

Article One of [the Emergency Decree] provided that Peru thereby:

> Establish[ed] a financial reward in the amount of U.S. $5,000,000.00 (FIVE MILLION 00/100 UNITED STATES DOLLARS), which shall be given to the person or persons who provide(s) accurate information that will directly enable locating and capturing Vladimiro Lenin Montesinos Torres. In the event several persons provide the said information, the financial reward shall be divided among them.

(Compl. Ex. A). Article Three of the decree defined "accurate information":

4

It turned out that Guevara, a Venezuelan national, was providing Montesinos

with a hiding place and a security detail in Caracas, Venezuela.  In addition,

Guevara was handling Montesinos's communications with Pacific Industrial Bank

in Miami, Florida, where Montesinos maintained a bank account.  When the bank

declined his request to transfer his funds to another bank, Montesinos emailed

Percovich, the officer assigned to the account, threatening him with physical harm

unless the bank honored his request.  Montesinos then sent Guevara to Miami with

instructions for Percovich.  Percovich, aware that Guevara was coming to Miami,

contacted the FBI in the meantime to inform them of Montesinos's threat and

Guevara's involvement with Montesinos, so when Guevara arrived in Miami in

June 2001, the FBI detained him and prepared to charge him with a criminal

offense.[5]  The FBI informed Guevara that he would not be charged if he disclosed

---

> For purposes of this Emergency Decree, accurate information shall be that
> [information] provided through any means to the Special High Level Committee
> and which enables locating and capturing Vladimiro Lenin Montesinos Torres,
> who is wanted.

Id. (bracketed word in original)

Guevara I, 468 F.3d at 1293.

[5]  The record before the district court, when it ruled on Guevara's motion for summary judgment
following the disposition of Guevara I, reveals that the FBI was in the process of filing a
criminal complaint charging Guevara with conspiring with Montesinos to threaten Percovich
through a series of emails. The charges were later dismissed due to Guevara's assistance to the
FBI in capturing Montesinos.

5

Montesinos's whereabouts. And, if Montesinos was captured, Guevara could claim the $5 million reward Peru had posted.[6]

Guevara cooperated; he revealed Montesinos's location in Caracas and arranged through some of his associates in Caracas for Montesinos to be delivered into the hands of Venezuelan officials. They arrested Montesinos and turned him over to the Peruvian authorities. Peru, however, refused to pay Guevara the $5 million reward.

B.

Guevara sued Peru in Florida state court, and Peru removed the case to the United States District Court for the Southern District of Florida under 28 U.S.C. § 1441(d). Guevara framed his complaint in five counts, as set out in the margin.[7] Peru moved to dismiss the case pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602–1611, rendered it immune from suit. The district court granted Peru's motion on the ground that Peru's conduct did not fall under any of the enumerated

---

[6] The FBI was aware of the reward because it had been widely publicized.

[7] Count One alleged breach of contract by the Republic of Peru. Count Two alleged breach of contract implied in law by the Republic of Peru. Count Three alleged breach of contract by the Ministry of the Interior. Count Four alleged fraudulent inducement by the Minister of the Interior during the events leading to Montesinos's capture. Count Five (mislabeled as Count Four) alleged fraudulent misrepresentation by the new Minister of the Interior, who assumed that position when the former minister left office in July 2001.

6

exceptions to the FSIA's presumption of sovereign immunity.  Guevara then appealed the dismissal to this court.

We held that Peru's offer of a reward fell within the FSIA's commercial activity exception.[8]  We reasoned that instead of using its own police and investigatory powers to search for Montesinos, Peru "'ventured into the marketplace' . . . to buy the information needed to get its man."  Guevara I, 468 F.3d at 1299 (quoting Hond. Aircraft Registry, Ltd. v. Gov't of Hond., 129 F.3d 543, 547 (11th Cir. 1997)).  Because sovereign states can engage in commercial activities by contracting with private parties, id. at 1300, and because Peru acted like a private party in entering the market for rewards, id. at 1301, the FSIA's definition of "commercial activity" in 28 U.S.C. § 1603(d) fully encompassed the reward, id. at 1305.  In turn, because a state's private, commercial acts divest it of sovereign immunity under the so-called "restrictive theory," id. at 1297, Peru was not immune from suit under the FSIA's exception.  We accordingly vacated the

_____

[8]  As detailed infra, the FSIA creates a presumption that foreign sovereigns are immune from suit in U.S. courts unless they fall under an exception within the statute. 28 U.S.C. § 1604. The commercial activity exception prevents a foreign state from claiming immunity in cases

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Id. § 1605(a)(2).

7

district court's judgment and remanded the case for further proceedings.

On remand, the district court issued a new scheduling order and the parties

engaged in discovery.  At the close of discovery, Guevara moved the court for

summary judgment on two counts of his complaint, those claiming breach of

contract,[9] arguing that he was entitled to the reward because he had fulfilled the

terms of Peru's offer.  Deposition and affidavit evidence submitted in support of

Guevara's motion had provided new information about Guevara's role in

Montesinos's capture.  We now recount the facts that evidence established.[10]

C.

Guevara was formerly an officer in the Venezuelan intelligence agency,

Dirección Nacional de los Servicios de Inteligencia y Prevención ("National

Directorate of Intelligence and Prevention Services") ("DISIP").[11]  On December

15, 2000, Guevara received a telephone call from his second cousin asking him to

receive a visitor at Guevara's residence in Caracas.  Later that day, one Julio Ayala

---

[9] Counts One and Three.  See supra note 7.  The district court dismissed Count Two on Guevara's stipulation and, in a separate order, granted summary judgment to the two Ministers of the Interior on Counts Four and Five.  The parties do not contest that order.

[10] We recount the facts in the light most favorable to Guevara.

[11] DISIP has since been redesignated as Agencia Bolivariana de Noticias ("Bolivarian Intelligence Service").  Agencia Bolivariana de Noticias, Venezuelan Disip to be now designated as Bolivarian Intelligence Service, http://www.abn.info.ve/noticia.php?articulo=210391 (last visited May 4, 2010).

brought a man wearing facial bandages, whom Ayala identified as Manuel
Rodriguez, to Guevara's house. Guevara later realized that the man going by the
name Manuel Rodriguez was actually Montesinos, who had undergone facial
reconstructive surgery to conceal his identity.

Guevara's second cousin asked Guevara to provide ongoing security for
Montesinos. Guevara agreed and saw to it that Montesinos was protected while he
was in hiding in Caracas.[12] For his part, Montesinos used Guevara as an
intermediary to run personal errands and to arrange for the deposit of funds into
Montesinos's accounts in U.S. banks. On June 20, 2001, Guevara traveled to
Miami for Montesinos to deliver an envelope to Percovich at Pacific Industrial
Bank. The envelope contained a letter instructing Percovich to give Guevara
$700,000 cash from Montesinos's account at the bank, and to transfer $3 million
from that account to an account Montesinos had opened at another bank.[13] Guevara
met Percovich at the Intercontinental Hotel in Miami on June 22 and gave him the
envelope. While Guevara was leaving the Intercontinental Hotel, FBI agents

---

[12] Two days after receiving Montesinos, Guevara moved Montesinos to the Caracas home of a
sister of Jose Luis Nunez, who had previously worked as a bodyguard for Guevara. Nunez
apparently did not serve as Montesinos's bodyguard; his role appears to have been limited to
providing a hiding place for Montesinos at his sister's home. Approximately three to four weeks
prior to his capture, Montesinos moved to Nunez's home for, according to Guevara, "strategic
reasons."

[13] Apparently, the FBI had notified Pacific Industrial Bank of Montesinos's fugitive status, and
the bank had frozen Montesinos's account.

arrested him.[14] After the agents took Guevara into custody, they questioned him

briefly at the hotel where he was staying, then moved him to the FBI office in

Miami.

The questioning resumed at the FBI office. The agents informed Guevara of

the $5 million reward for information that would lead to Montesinos's capture.

---

[14] On June 24, 2001, an FBI special agent swore out a criminal complaint against Guevara, charging him with violating 18 U.S.C. §§ 875(b), 371, and 2. The complaint charged Guevara with conspiring with Montesinos to threaten Pacific Industrial Bank and its officials, specifically Percovich, with harm if they did not deliver the money in accordance with Montesinos's instruction. Section 875(b) provides that

[w]hoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 875(b). The alleged § 875(b) violation formed the predicate offense for the § 371 charge. Section 371 reads:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

18 U.S.C. § 371. Lastly, § 2 governs accomplice liability:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

Guevara decided to cooperate, in that he would give the agents Montesinos's location if the charges were dropped and he received the reward. At this point, Agent Waldo Longa made a telephone call, then told Guevara that if he gave the FBI Montesinos's address and telephone number in Caracas, he would be released, the charges would be dropped, and he would receive the $5 million reward. Guevara agreed to do that, and under the supervision of FBI agents, he called Jose Luis Nunez's residence, where Montesinos was hiding. Guevara briefly spoke with Montesinos and, as the FBI had instructed, told Montesinos that Percovich had received the envelope. The FBI transmitted this information to Venezuelan authorities, who were cooperating with the Peruvian authorities, and developed a plan for Guevara's associates in Venezuela to deliver Montesinos to the Peruvian embassy in Caracas on June 23.[15]

On the evening of June 22, the FBI transferred Guevara to the Federal Detention Center in Miami for overnight custody. The following morning, June 23, the FBI brought Guevara back to its Miami office, where he made more telephone calls to his Venezuelan associates, including Nunez, to coordinate

---

[15] The FBI did so because, following Montesinos's disappearance and the posting of the $5 million reward, the United States had agreed to cooperate with Peru in trying to locate Montesinos. The plan was developed by Kevin Currier, who was an FBI special agent stationed in Chile, see infra note 17, and FBI agents in Miami.

Montesinos's handover to the Peruvian embassy.[16] Nunez assured Guevara that Montesinos would be handed over later that day, and Guevara relayed this assurance to the FBI.

While Guevara was in the FBI office that day, Agent Longa informed Guevara that he had spoken by telephone with the FBI agent responsible for overseeing the FBI interests in Peru, Kevin Currier,[17] and with Antonio Ketin Vidal Herrera ("Vidal"), Peru's Minister of the Interior.[18] During the call, Vidal said that Guevara would be eligible to receive the $5 million reward if he gave the FBI Montesinos's location in Caracas. Several hours after this conversation, the FBI asked Guevara to give final instructions to Nunez on where to turn over Montesinos; Guevara complied, and Nunez agreed to the instructions. On June 24, Longa told Guevara that Montesinos had been captured by Venezuelan authorities in Caracas the day before. On June 25, Guevara was released from custody, and the charges against him were dismissed.

---

[16] The record is not clear about the identity of these associates, other than Nunez. We assume Guevara had enlisted others to assist in hiding Montesinos at Nunez's house.

[17] At the time of these events, Kevin Currier was an FBI supervisory special agent and legal attaché stationed at the U.S. embassy in Santiago, Chile. At that post, Currier also had territorial responsibility for the FBI's objectives in Peru. Currier was involved in the case because in December 2000, he had responded to a request by the U.S. Ambassador to Peru for the FBI's assistance in apprehending Montesinos.

[18] Currier had called Longa from Chile earlier in the day and, after reaching Longa, arranged to have Vidal join their telephone conversation from Peru.

12

D.

Peru responded to Guevara's motion for summary judgment by arguing that based on the facts that had been developed on remand, the district court should dismiss the case on the ground that Peru had not waived its sovereign immunity under 28 U.S.C. § 1605(a). In an order entered on September 9, 2008, the district court rejected the argument, concluding that Guevara I had decided the sovereign immunity issue adversely to Peru.[19] The court therefore proceeded to rule on the merits of Guevara's motion for summary judgment. The court held that the Emergency Decree had created a unilateral contract and that Guevara had satisfied the performance the contract called for by providing information that led to Montesinos's capture. Then, relying on an August 5, 2002 SHLC resolution acknowledging that Guevara had provided such information and that the SHLC would evaluate his reward request, the court effectively preempted the SHLC's evaluation decision—concluding that, on the basis of the record before the court, the SHLC was bound to honor Guevara's request and thus to give him the entire $5 million reward.

On September 18, 2008, after the district court had granted Guevara's

---

[19] The district court disposed of Peru's sovereign immunity argument with this brief comment: "jurisdiction in this case has been established" by Guevara I.

motion for summary judgment but before it entered final judgment in the case,

Percovich moved the court, pursuant to Federal Rule of Civil Procedure 24(a)(2),

to grant him intervention as of right as a co-plaintiff, or alternatively, to stay

further proceedings in the case.  Percovich claimed that he was responsible for

causing Guevara to cooperate with the FBI and to reveal Montesinos's

whereabouts, and that but for his (Percovich's) cooperation, Montesinos would not

have been captured.  As a result, Percovich contended, he was entitled to at least a

share of the reward, and his rights would go unprotected if he were denied an

opportunity to prove his claim to the reward money.  The district court denied

Percovich's motion on December 1, 2008.  On December 17, 2008, the district

court entered final judgment in Guevara's favor for $5 million plus pre- and post-

judgment interest.  Percovich's appeal and Peru's cross-appeal followed.[20]

## II.

Peru contends that the district court should have dismissed the case for lack

of subject matter jurisdiction on the ground that it is entitled to sovereign immunity

under 28 U.S.C. § 1605(a).  Assuming that we hold that it was not entitled to

sovereign immunity, Peru contends that the district court erred in granting

Guevara's motion for summary judgment on the merits.  Percovich contends that

---

[20] We have jurisdiction of the appeal from the district court's final judgment under 28 U.S.C. § 1291.

14

the court abused its discretion in refusing to grant him intervention as of right. If Peru is entitled to sovereign immunity, the case is due to be dismissed for want of subject matter jurisdiction, and we would be foreclosed from proceeding further. We therefore turn to the question of whether Peru is entitled to sovereign immunity under § 1605(a).

The district court concluded that, in Guevara I, we already resolved this § 1605(a) issue. We disagree. We begin with the proposition that the FSIA "provides the sole basis for obtaining subject matter jurisdiction over a foreign sovereign in the United States," Guevara I, 468 F.3d at 1294, and grants original jurisdiction over nonjury civil actions against foreign states, 28 U.S.C. § 1330(a).[21] The exercise of that jurisdiction is limited to the FSIA's exceptions to the general rule that foreign sovereigns enjoy immunity from suit in United States courts. Id.; see also id. § 1605(a). Section 1605, "General exceptions to the jurisdictional immunity of a foreign state," provides:

(a) A foreign state shall not be immune from the jurisdiction of courts

---

[21] This section provides:

> The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605–1607 of this title or under any applicable international agreement.

28 U.S.C. § 1330(a).

15

of the United States or of the States in any case—

    (1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;

    (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605.

    In <u>Guevara I</u>, Guevara appealed the district court's decision that Peru was entitled to sovereign immunity because its offer of a reward did not constitute "a commercial activity." In reaching its decision, the district court bypassed the question of whether, assuming that the offer of a reward constituted a commercial activity, Peru established that it had immunity under subsection (a)(2). In appealing the district court's decision, Guevara, in his opening brief, focused his argument for reversal solely on the commercial activity issue. Peru, in its answering brief, did the same. Its brief did not seek affirmance on the additional ground the district court had not reached: whether it had immunity under subsection (a)(2).

Guevara I thus resolved the issue Guevara had raised—whether Peru's offer
of a reward was a commercial activity—and resolved it against Peru.  In doing so,
the court left open, albeit implicitly, the question of whether the district court had
subject matter jurisdiction to entertain Guevara's case.  Guevara I, 468 F.3d at
1305 ("If the court finds that it does not have subject matter jurisdiction, 'the
court's sole remaining act is to dismiss the case for lack of jurisdiction.'") (quoting
Morrison v. Allstate Indem. Co., 228 F.3d 1255, 1261 (11th Cir. 2000)).

In holding that Guevara I resolved the sovereign immunity issue against
Peru, the district court was, in effect, invoking the law of the case doctrine.

The law of the case doctrine is not an "inexorable command," White
v. Murtha, 377 F.2d [428,] 431 [(5th Cir. 1967)], but rather a salutary
rule of practice designed to bring an end to litigation, id., discourage
"panel shopping," Lehrman v. Gulf Oil Corp., 500 F.2d 659, 662 (5th
Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1128, 43 L.Ed.2d 400
(1975), and ensure the obedience of lower courts.  United States v.
Williams, 728 F.2d 1402, 1406 (11th Cir. 1984).  As with the mandate
rule, the law of the case doctrine applies to all issues decided
expressly or by necessary implication; it does not extend to issues the
appellate court did not address.  Terrell v. Household Goods Carriers'

17

Bureau, 494 F.2d 16, 19 (5th Cir.[ 1974]), cert. dismissed, 419 U.S.
987, 95 S. Ct. 246, 42 L. Ed. 2d 260 (1974); Fogel v. Chestnutt, 668
F.2d 100 (2d Cir.1981), cert. denied, 459 U.S. 828, 103 S. Ct. 65, 74
L. Ed. 2d 66 (1982).

Piambino v. Bailey, 757 F.2d 1112, 1120 (11th Cir. 1985).

In light of the parties' Guevara I briefs on appeal and the court's statement
that the district court must dismiss the case "if it does not have subject matter
jurisdiction," we could hardly say that Guevara I decided all of the sovereign
immunity issues § 1605(a)(2) presents. We therefore conclude that those
issues—with the exception of whether the offer of a reward constituted "a
commercial activity"—remain for decision here. We now address them de novo.
Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A., 210 F.3d
1309, 1311 (11th Cir. 2000) (per curiam).

Section 1605(a)(2) lists three exclusive bases, or nexuses, for a foreign
state's commercial activities to subject it to the United States courts' jurisdiction:
in cases (1) based upon commercial activities within the United States, (2) based
upon acts performed in the United States "in connection with" commercial activity
elsewhere, or (3) based upon acts performed in connection with commercial
activity elsewhere that cause a "direct effect" in the United States. See Samco

Global Arms, Inc. v. Arita, 395 F.3d 1212, 1216 & n.8 (11th Cir. 2005).

The district court did not analyze whether Peru's activity fell under any of the three bases for jurisdiction in § 1605(a)(2) because it apparently assumed that Guevara I had performed the analysis. Guevara I, however, merely held, as we observed above, that Peru's reward offer constituted commercial activity. It held nothing regarding the existence of subject matter jurisdiction, and, in fact, the opinion implicitly recognized the possibility that the district court could discover a lack of subject matter jurisdiction later in the case.[22] We now embark on the task the district court assumed Guevara I had undertaken: whether Peru was subject to the district court's jurisdiction under one or more of the three jurisdictional nexuses of § 1605(a)(2). In carrying out this task, we rely on the record before the district court when it entertained and granted Guevara's motion for summary judgment.[23] More to the point, we consider the evidence that bears on § 1605(a)(2)'s three jurisdictional nexuses.

The evidence bearing on the first nexus, commercial activities within the

---

[22] The Guevara I opinion did not discuss the nexus requirement of 28 U.S.C. § 1605(a), and after reviewing the parties' Guevara I briefs, we find that the parties did not present the nexus issue to the court in the context of subject matter jurisdiction. We thus reject Guevara's argument that Guevara I decided the nexus issue "by implication."

[23] As stated in note 10, supra, we consider the evidence in that record in the light most favorable to Guevara. We do so because it is Peru's burden to demonstrate the lack of subject matter jurisdiction in the context presented here.

United States, establishes that no such activities occurred in the United States.

Rather, the commercial activity in this case, described by Guevara I as an "offer of

a reward for information enabling the capture of a fugitive," 468 F.3d at 1301, took

place in Peru.[24] First, the Emergency Decree, which created the offer, was

published in an official publication in Peru. Second, the Decree established the

SHLC to evaluate the veracity of information leading to Montesinos's arrest and

decide whether to pay the reward. If the SHLC decided to pay the reward, the

payment would be made in Peru from funds the Peruvian government had placed

in escrow in a Peruvian bank. In short, all of the SHLC's commercial activity

would take place in Peru. Although information leading to Montesinos's capture

might be provided by someone in the United States, as it was here, the act of

providing the information to the SHLC would not be part of the commercial

activity.[25] Therefore, by offering the reward, Peru was not waiving its sovereign

---

[24] Under the FSIA, "commercial activity" is

> either a regular course of commercial conduct or a particular commercial
> transaction or act. The commercial character of an activity shall be determined by
> reference to the nature of the course of conduct or particular transaction or act,
> rather than by reference to its purpose.

28 U.S.C. § 1603(d).

[25] If the person providing the information was an agent of the Republic of Peru located in the United States, one could argue that such provision constituted commercial activity by Peru in the United States. See 28 U.S.C. § 1603(e). But that is not the case here.

immunity from suit in the United States by a person who may have provided information that led to Montesinos's capture.

Next, the evidence bearing on the second nexus, acts committed by Peru in the United States "in connection with" commercial activity elsewhere, established that on June 23, Currier (in Chile) placed a long distance telephone call to Longa (in Miami) and to Vidal (in Peru). During the call, Vidal told Longa that Guevara would receive the reward if he provided information that led to Montesinos's capture. The narrow question here is whether Vidal's act of communicating these words to Longa in Miami constituted an act performed in the United States "in connection with" Peru's offer of the reward in Peru and, thus, was sufficient to waive Peru's sovereign immunity under the second nexus.

The SHLC was a special committee of the Ministry of the Interior. Vidal was the Minister of the Interior; we thus assume that he had supervisory authority over the SHLC. Vidal's statement to Longa was a statement he would have made to anyone professing to have information that might lead to Montesinos's capture: "If you believe that your information has led to Montesinos's capture, you may submit it to the SHLC. If the SHLC determines that it is reliable, you will receive the reward. If similar information is submitted to the SHLC by others and found reliable, they will share in the reward."

21

If what Vidal said to Longa constituted an act in connection with Peru's offer of the reward, then almost any statement he may have made about the reward to anyone else in the United States would have operated to waive Peru's immunity from suit. We are reluctant to find a waiver based on such de minimis evidence.

The federal courts' application of § 1605's exceptions to sovereign immunity supports our position. For example, section 1605(a)(1) provides that a foreign state shall not be immune in any case "in which [it] has waived its immunity either explicitly or by implication." In Creighton Ltd. v. Government of the State of Qatar, 181 F.3d 118, 122 (D.C. Cir. 1999), the court stated that

> implicit in § 1605(a)(1) is the requirement that the foreign state have intended to waive its sovereign immunity. See Princz v. Federal Republic of Germany, 26 F.3d 1166, 1174 ([D.C. Cir.] 1994) ("[A]n implied waiver depends upon the foreign government's having at some point indicated its amenability to suit"); Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 444 (D.C. Cir. 1990) ("courts rarely find that a nation has waived its sovereign immunity . . . without strong evidence that this is what the foreign state intended").

The offer of the reward was made in Peru and was to be administered in Peru by the SHLC. We assume, for purposes of this case, that Vidal, by virtue of his position as Minister of the Interior, had the authority to waive the state's immunity.[26] That said, we are unwilling to hold that Vidal intended to waive

---

[26] Guevara also filed a declaration purporting to show two pieces of evidence that Peru committed acts in the United States in connection with commercial activity in Peru: first, that

Peru's sovereign immunity via the solitary act of telling a person in the United States what he must do to obtain the reward.

Lastly, the evidence bearing on the third nexus had to establish that Peru's actions "in connection with" commercial activity outside the United States caused "a direct effect" within the United States. To be direct, an effect must follow "as an immediate consequence of the defendant's activity." Republic of Arg. v. Weltover, Inc., 504 U.S. 607, 618, 112 S. Ct. 2160, 2168 (1992) (quotation and ellipses omitted). As we have framed it, "the question presented is, 'was the effect sufficiently "direct" and sufficiently "in the United States" that Congress would have wanted an American court to hear the case?'" Harris Corp. v. Nat'l Iranian Radio & Television, 691 F.2d 1344, 1351 (11th Cir. 1982) (quoting Tex. Trading & Milling Corp. v. Fed. Republic of Nig., 647 F.2d 300, 313 (2d Cir. 1981)).

In Harris, an American manufacturer of FM transmitters (Harris Corporation) sued to enjoin payment on a letter of credit that an Iranian state bank extended to Harris Corporation as part of a performance guarantee in favor of an

---

Vidal traveled to Miami in July 2001, after Montesinos had been apprehended, to personally thank Guevara for his assistance and to confirm that Guevara would receive the reward, and second, that in February 2002, Guevara met in Miami with a Peruvian judge and prosecutor who allegedly had been asked by the then-Minister of the Interior, Fernando Rospigliosi, to tell Guevara that Peru would pay him the reward. Even if we believed that this scant evidence was sufficient to overcome the heavy burden required to show that Peru waived its sovereign immunity (and we do not), Guevara's declaration is a classic unsworn, self-serving statement that would be inadmissible if offered at trial.

23

Iranian broadcaster. Harris Corporation contended that the letter of credit and associated performance guarantee had been terminated by force majeure—namely, the 1979 Iranian revolution. The guarantee was an integral part of the contract between Harris Corporation and the Iranian broadcaster, and was backed by a standby guarantee that required Harris Corporation to indemnify Continental Bank, which would reimburse the Iranian bank if the latter had to pay on the first letter of credit. Harris Corporation sought to enjoin the Iranian bank's receiving payment from Continental Bank because in the injunction's absence, Harris Corporation would have been obligated to indemnify Continental Bank to the extent it reimbursed the Iranian bank's payment on the original letter of credit. The district court granted the injunction, and, on appeal, the Iranian bank argued that the district court lacked subject matter jurisdiction under the FSIA. In rejecting that argument, this court held that the letter of credit arrangement "extend[ed] into this country, and the appellants' demands thus ha[d] significant . . . financial consequences here," establishing a direct effect for purposes of § 1605(a)(2). Harris Corp., 691 F.2d at 1351.

Here, Guevara presents two ways in which direct effects in the United States flowed from Peru's promise to pay the reward in Peru, neither of which we find persuasive. First, he argues that he accepted the reward offer while in custody in

24

Miami, creating a direct effect in the United States. The record, however, indicates that the extent of Guevara's acceptance-related activity was the alleged, one-off telephone communication between Vidal, Currier, and Longa. In the context of personal jurisdiction, however, we have rejected the argument that one telephone call is sufficient to create minimum contacts with the forum state, see Future Tech. Today, Inc. v. OSF Healthcare Sys., 218 F.3d 1247, 1251 (11th Cir. 2000); cf. Sculptchair, Inc. v. Century Arts, Ltd., 94 F.3d 623, 628 (11th Cir. 1996) (rejecting, as a basis for jurisdiction under Florida's long-arm statute, "a series of telephone conversations" and a one-hour meeting between the Canadian defendant and the plaintiff's Florida office), and we find the same reasoning applicable here. At oral argument, moreover, counsel for Guevara conceded that the primary activity for purposes of § 1605(a)(2)'s analysis was really Peru's failure to make the reward payment within the United States—a sort of "negative activity." We are unaware of any federal court holding that such "negative activity" satisfies the jurisdictional requirements of § 1605(a)(2), and we decline to reach that holding here.

Second, Guevara argues that his arrest in the United States constituted a direct effect in the United States of SHLC's commercial activity in Peru. The FBI arrested Guevara because he was participating in the execution of Montesinos's

25

threats of physical harm to Percovich if Percovich did not handle Montesinos's bank deposits as instructed. Guevara's arrest was "an immediate consequence" of his criminal activity, not of Peru's offer of a reward for Montesinos's capture. Only after Guevara was arrested and agreed to cooperate with investigators did the availability of reward money come into play.[27]

Neither of Guevara's arguments for a direct effect in the United States reflects Weltover's requirement of immediate consequences or Harris Corp.'s focus on significant financial consequences in the United States. Therefore, we cannot conclude that a direct effect occurred in the United States as a result of Peru's promise to pay the reward money.

### III.

Guevara I did not resolve in full the jurisdictional issues presented by 28 U.S.C. § 1605(a)(2). Accordingly, the district court should have determined whether Peru was subject to the court's subject matter jurisdiction because Peru failed to establish that its commercial activity fell under one of the § 1605(a)(2) nexuses for jurisdiction. The court failed to do so. This left us with two possible

---

[27] We also note Vidal's testimony that neither he nor members of the Peruvian government contacted United States law enforcement officials directly to effectuate Montesinos's capture. The extent of Peruvian involvement with United States law enforcement, Vidal testified, was as part of a request to several intelligence organizations and law enforcement agencies worldwide to assist in the search for Montesinos.

dispositions: (1) remand the case to the district court with the instruction that it resolve the § 1605(a)(2) issues, or (2) resolve those issues on appeal because the appropriate disposition is clear.  We have chosen the latter course.  We REVERSE the district court's judgment and REMAND the case with the instruction that the case be dismissed without prejudice.

SO ORDERED.

COX, Circuit Judge, dissenting:

The majority opinion rests on a faulty premise: that, in deciding the prior appeal in this case, this court did not decide whether Peru is entitled to sovereign immunity. The court holds that *Guevara I* decided only the question of whether Peru's offer of the reward constituted commercial activity. But that is incorrect. *Guevara I* held that FSIA's commercial activity exception applies to exempt Peru from the general immunity granted by the statute to foreign sovereigns. 468 F.3d at 1292 ("This appeal presents the issue of whether a foreign state's offer of a reward in return for information enabling it to locate and capture a fugitive falls within the Foreign Sovereign Immunities Act's commercial activity exception to sovereign immunity. For the reasons that follow, we conclude that it does."); *id.* at 1299 ("The question in this appeal is whether Guevara can use the courts of this country to compel Peru to keep its contractual promise to pay him the money it offered.").

The commercial activity exception states:

(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case–

. . . .

(2) in which the action is based upon a commercial

28

> activity carried on in the United States by the foreign
> state; or upon an act performed in the United States in
> connection with a commercial activity of the foreign state
> elsewhere; or upon an act outside the territory of the
> United States in connection with a commercial activity of
> the foreign state elsewhere and that act causes a direct
> effect in the United States[.]

28 U.S.C. § 1605(a)(2). In deciding that the statutory exception applies to Peru's

actions, the *Guevara I* court decided more than that Peru had engaged in

commercial activity; the court necessarily decided that a nexus existed between

that commercial activity and the United States. It implicitly held that the

commercial activity was carried on in the United States, that an act was performed

in the United States in connection with commercial activity elsewhere, or that a

direct effect of the commercial act was caused in the United States.

Most importantly, the *Guevara I* court explicitly decided that there was no

immunity available to Peru under the FSIA. In explaining that the individual

defendants were not entitled to sovereign immunity because any such immunity

would be derivative of the sovereign state's immunity, the opinion says:

> There is no present need to review the district court's conclusion that
> the individual defendants were acting within the scope of their
> authority. Even if they were, they are not entitled to sovereign
> immunity because the sovereign itself is not.

*Guevara I*, 468 F.3d at 1305 (emphasis added).

29

*Guevara I* did not implicitly leave open the question of subject matter jurisdiction, remanding the case for the district court to decide that question. In claiming that it did, the majority opinion takes a statement in the *Guevara I* opinion out of context. *Guevara I* reversed the district court's dismissal of the case on subject matter jurisdiction grounds and remanded the case with the sole instruction that personal jurisdiction over the individual defendants could be examined by the district court. *Id.* at 1305-06. In explaining what the district court had already done and why the district court had not considered the personal jurisdiction arguments of the individual defendants, the *Guevara I* opinion said, "If the court finds that it does not have subject matter jurisdiction, 'the court's sole remaining act is to dismiss the case for lack or jurisdiction.'" *Id.* at 1305 (citations omitted).[28] Contrary to the majority opinion's assertion, the quoted statement is not

---

[28]The full section of the opinion containing the quoted statement reads as follows:

> The individual defendants contend that we ought to affirm the judgment dismissing them from the lawsuit anyway, on the ground that the district court lacked personal jurisdiction over them. The district court, having found that they were entitled to sovereign immunity, dismissed their challenge to personal jurisdiction as moot. That result followed from the district court's conclusion that the defendants were immune under the FSIA, which limits the subject matter jurisdiction of the federal courts. 28 U.S.C. § 1604 (stating that if the Act applies, "a foreign state shall be immune from the jurisdiction of the courts of the United States"). "[A] court should inquire into whether it has subject matter jurisdiction at the earliest possible stage in the proceedings." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). If the court finds that it does not have subject matter jurisdiction, "the

an indication to the district court that, on remand, it should reconsider subject matter jurisdiction.

*Guevara I*'s holding that the commercial activity exception to sovereign immunity applies to Peru's activities is a holding that subject matter jurisdiction exists over this case pursuant to the FSIA. That is the law of this case, notwithstanding the fact that the *Guevara I* opinion did not explicitly address the nexus between Peru's commercial activities and the United States. *See EEOC v.*

---

court's sole remaining act is to dismiss the case for lack of jurisdiction." *Morrison v. Allstate Indem. Co.*, 228 F.3d 1255, 1261 (11th Cir. 2000).

Because we disagree with the district court that the FSIA bars Guevara's suit, the individual defendants' motion to dismiss for lack of personal jurisdiction is again relevant. However, the district court should have the first opportunity to resolve it. Defendants cite *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S. Ct. 454, 459, 87 L. Ed. 626 (1943), for the proposition that we must affirm the decision of a district court if it reached the correct result but for the wrong reason. The *Chenery* case notes that this rule does not apply "where the correctness of the lower court's decision depends upon a determination of fact." *Id.* Our own decisions are to the same effect. *See Pacheco de Perez v. AT&T Co.*, 139 F.3d 1368, 1372 n.5 (11th Cir. 1998) ("We are mindful of the general rule that a court of appeals will not consider issues not reached by the district court, especially where the issues involve questions of fact."); *Stewart v. Dep't of Health and Human Servs.*, 26 F.3d 115, 115-16 (11th Cir. 1994) (same). The "minimum contacts" prong of the personal jurisdiction inquiry is necessarily case and fact specific. We decline to take up that issue without the benefit of factfindings from the district court. Vidal and Rospigliosi may reassert on remand the issue of the district court's jurisdiction over their persons.

*Guevara I*, 468 F.3d at 1305-06.

31

*Int'l Longshoremen's Ass'n*, 623 F.2d 1054, 1058 (5th Cir. 1980) (noting that the law of the case doctrine applies to "things decided by necessary implication as well as those decided explicitly.") (quotation and citation omitted); *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) (adopting as precedent decisions of the Former Fifth Circuit handed down prior to the close of business on September 30, 1981). The district court did not err in so finding, and this panel cannot properly revisit the question. *See Free v. Abbott Labs., Inc.*, 164 F.3d 270, 272-273 (5th Cir. 1999)[29] (joining other circuits in refusing to recognize a "jurisdiction exception" to the law-of-the-case doctrine; explaining that although a federal court must examine each case to determine whether it has subject-matter jurisdiction, this does not require "perpetual re-examination of precisely the same issue of subject matter jurisdiction"); *see also McKesson Corp. v. Islamic Republic of Iran*, 52 F.3d 346, 350 (D.C. Cir.1995) (applying the law-of-the-case doctrine to a prior appeals panel's ruling concerning the existence of subject matter jurisdiction); *Hanna Boys Center v. Miller*, 853 F.2d 682, 686 (9th Cir. 1988) (same).

Although I disagree with the majority's conclusion that the FSIA bars Guevara's suit, I have reservations about the propriety of resolving this dispute in

---

[29]Affirmed by an equally divided court, 529 U.S. 333, 120 S. Ct. 1578 (2000).

the courts of this country.   Dismissal pursuant to the discretionary doctrine of international comity, rather than dismissal for want of jurisdiction, may be the appropriate way to dispose of this case.[30]   The Peruvian government created the reward and the Special High Level Committee charged with administering the reward.   After considering Guevara's claim to the reward, the Committee rejected his claim.   I suspect it would violate international comity for United States courts to review that decision.

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

---

[30]International comity is an abstention doctrine.  "A federal court has jurisdiction but defers to the judgment of an alternative forum."  *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1237 (11th Cir. 2004) (citing *Turner Entm't Co. v. Degeto Film*, 25 F.3d 1512, 1518 (11th Cir. 1994)).